■ In the Matter of CHARLES M. LEWIS, Petitioner, v BARBARA DeBUONO, as Commissioner of the New York State Department of Health, et al., Respondents. [684 NYS2d 649] —Carpinello, J. Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Public Health Law § 230-c [5]) to review a determination of the Administrative Review Board for Professional Medical Conduct which revoked petitioner's license to practice medicine in New York.

In May 1996, the Bureau of Professional Medical Conduct charged petitioner, a family practitioner, with eight specifications of misconduct relating to his treatment of two patients (hereinafter patient A and patient B), including negligence on more than one occasion (see, Education Law § 6530 [3]), gross negligence (see, Education Law § 6530 [4]), incompetence on more than one occasion (see, Education Law § 6530 [5]), gross incompetence (see, Education Law § 6530 [6]) and failing to maintain accurate records (see, Education Law § 6530 [32]). Following a fact-finding hearing, a Hearing Committee of the State Board for Professional Medical Conduct found petitioner guilty of each charge and revoked his medical license. Upon administrative appeal, the Administrative Review Board for Professional Medical Conduct (hereinafter ARB) sustained the findings of guilt and penalty, a determination now challenged by petitioner in this CPLR article 78 proceeding.

We confirm. First, petitioner offered no convincing proof that his rights to a fair hearing and due process were violated because of a theoretical conflict of interest on the part of his attorney at the hearing. Without specificity or detail, petitioner alleges in the petition that, because this attorney represented him in a medical malpractice action concerning patient A, "a conflict situation" arose irreparably prejudicing him and denying him the opportunity to properly defend himself and be heard. In his brief, petitioner amplifies these contentions by speculating that counsel "may [have been] more concerned with preserving insurance money than defending [his] license". In support of his claim that he was prejudiced, petitioner points to the fact that, at the advice of counsel, he did not testify with respect to his treatment of patient A.

The claims of conflict and resulting prejudice do not warrant remittal of this matter to the Hearing Committee because they are too speculative. The allegations are not borne out upon our review of the proceedings before the Hearing Committee nor

are they supported by an "affidavit * * * or other written proof" (CPLR 7804 [d]; *see, Matter of Santos v Chesworth,* 133 AD2d 1001, 1003; *Matter of Hancock v Town of Ramapo,* 131 AD2d 480, 481; *see generally, Matter of Miller v McMahon,* 240 AD2d 806). Moreover, even assuming that counsel's representation of petitioner in both matters constituted a conflict, petitioner presented no evidence (*see,* CPLR 7804 [d] [petition may be accompanied by affidavits or other written proof]) that the ramifications of this dual representation were not fully disclosed to him or that he did not consent to same (*see,* Code of Professional Responsibility DR 5-105 [C] [22 NYCRR 1200.24 (c)]). More importantly, since the Hearing Committee expressly found that the facts pertaining to either patient "would be sufficient to show that it is unsafe to permit [petitioner] to continue practicing medicine in this State", any alleged prejudice resulting from petitioner's failure to testify concerning patient A is of no significant consequence. Finally, to the extent that petitioner is claiming that counsel did not defend him as vigorously as he might otherwise have if this alleged conflict did not exist, we note further that the constitutional right to effective assistance of counsel does not extend to administrative proceedings of this type (*see, e.g., Matter of Post v State of N. Y. Dept. of Health,* 245 AD2d 985, 986; *Matter of Singla v New York State Dept. of Health,* 229 AD2d 798, *lv denied* 89 NY2d 809).

We are likewise unpersuaded by petitioner's contention that the findings of misconduct were unsupported by the evidence. Noting that this Court's inquiry is limited to whether the ARB's determination was arbitrary and capricious, affected by error of law or an abuse of discretion (*see, e.g., Matter of Gottesman v New York State Dept. of Health,* 229 AD2d 742, 743; *Matter of Chua v Chassin,* 215 AD2d 953, 954-955, *lv denied* 86 NY2d 708) and that this Court does not decide credibility issues or weigh the testimony of expert witnesses (*see, e.g., Matter of Chua v Chassin, supra; Matter of Moss v Chassin,* 209 AD2d 889, 891, *lv denied* 85 NY2d 805, *cert denied* 516 US 861), the evidence of petitioner's guilt, provided by the Bureau's expert witness, records of petitioner's examination and treatment of both patients and testimony from patient B's mother, was compelling.

Patient A was only 36 years old when he died on March 22, 1992 from an intracerebral hemorrhage. In May 1991, blood tests confirmed that he had a low platelet count consistent with thrombocytopenia, which carries the predictable risk of a spontaneous intracerebral hemorrhage. According to Steven

Tamarin, the Bureau's medical expert, petitioner failed to obtain and document patient A's medical history consistent with minimum standards of care. Tamarin also testified that petitioner's treatment of patient A's thrombocytopenia fell below minimum standards of care in that he failed to properly monitor the condition and ensure that he followed through with appropriate treatment. While Tamarin acknowledged that there is a notation in patient A's medical records that petitioner referred him to a hematologist, petitioner failed to document that he advised patient A of the risks and potential consequences of thrombocytopenia and failed to follow up on the condition by ensuring that patient A was actually examined by a necessary specialist and documenting that physician's tests and/or findings in his chart.

On March 11, 1992, patient A was admitted to the hospital by petitioner with blood in his urine. On the fifth day of his hospitalization, patient A experienced numbness and loss of strength in his left hand with a diminished ability to grasp, numbness in his left leg, a headache and right eye pain. Petitioner prescribed pain medication and tranquilizers to treat these symptoms. Although he contacted one neurologist who was unable to examine patient A until the following morning, petitioner never insisted that this or any other neurologist or hematologist examine him immediately. Following a massive cerebral hemorrhage the next day, patient A slipped into a coma and died several days later. According to Tamarin, petitioner did not meet minimum standards of care in this treatment of patient A in that he failed to recognize and address the acute and catastrophic nature of patient A's neurological changes in the setting of a low platelet count.

With respect to patient B, a 36-year-old malnourished woman weighing 95 pounds and complaining of stomach pain, the record reveals that within seven to nine hours of petitioner's examination of her, she died of acute purulent peritonitis caused by a ruptured tubo-ovarian abscess. Petitioner documented normal vital signs and no abnormalities for patient B (petitioner claims he noticed that she was "alarmingly thin" but did not document this observation). According to patient B's mother, during petitioner's brief examination of her, patient B informed him that she had lower abdominal pain, was gasping for breath and had a distended stomach. Moreover, petitioner did not ask patient B to fully disrobe, did not take her blood pressure and did not use a stethoscope during the examination. According to Tamarin, given the presence of an omentum seal around the tubo-ovarian abscess—a widespread

inflammatory process that takes place over a period of days as a result of pus in the abdomen—patient B must have been exhibiting some symptoms of peritonitis when petitioner examined her. Such symptoms would have included lower abdominal pain, abdominal rigidity and tenderness, diminished bowel sounds (detected by use of a stethoscope), fever, accelerated heart rate and low blood pressure. In light of this evidence, we are satisfied that the ARB's determination of guilt as to both patients was not lacking in a rational basis supported by fact.

Finally, given this evidence, we view the penalty of revocation as by no means "so incommensurate with the offense as to shock one's sense of fairness" (*Matter of Adler v Bureau of Professional Med. Conduct*, 211 AD2d 990, 993).

Cardona, P. J., Crew III, Yesawich Jr. and Peters, JJ., concur. Adjudged that the determination is confirmed, without costs, and petition dismissed.